[Civ. No. 5635.   Fourth Dist.   Apr. 17, 1958.]

CRULES R. CHEEK, as Trustee in Bankruptcy, etc., Appellant, v. HERBERT L. WHISTON et al., Respondents.

Pines & Walsh for Appellant.

Hawkins & Hawkins and Mack, Bianco, King & Eyherabide for Respondents.

MUSSELL, J.—This is an action to establish existence of a constructive trust in an oil royalty interest, to quiet title, and for an accounting.  The trial court rendered judgment that

plaintiff take nothing by his complaint and he appeals therefrom, claiming that the evidence is not sufficient to support the findings and judgment.

In 1922, the United States issued an oil and gas prospecting permit, covering oil lands in Kern County, to T. J. Wisecarver, and on January 18, 1922, Wisecarver entered into an operating agreement with defendant Midway McKittrick Oil Company whereby the latter agreed to develop part of the lands described in said permit. An overriding royalty was reserved to Wisecarver. On September 17, 1928, Midway McKittrick Oil Company entered into an operating agreement with H. L. Whiston covering portions of the property described in the permit and containing definite drilling commitments and a time limit for such exploration. This operating agreement was in turn assigned by Whiston on May 24, 1930, to California Oil Producers, a corporation, but Whiston omitted from this assignment certain property which he retained. On February 11, 1930, Wisecarver assigned and transferred to Whiston a certain proportion of the royalty owned and reserved to Wisecarver in the agreement with Midway McKittrick Oil Company dated January 18, 1922, amounting to 1 per cent of all oil and gas produced on premises known as "A acreage" under and subject to the terms of said agreement of January 18, 1922. On February 20, 1930, Whiston and his wife, who then owned 1 per cent of all oil and gas produced from the Wisecarver permit under the terms of the agreement of February 11, 1930, between Wisecarver and Whiston, transferred 7/12 of this said 1 per cent to various persons and on February 24, 1930, the Whistons transferred an additional 1/12 of said 1 per cent to one H. P. Walls. After these transfers the Whistons still owned and retained ownership of ⅓ of 1 per cent royalty interest and it is this ⅓ of 1 per cent interest which is involved in this action and which plaintiff claims is held in trust for his benefit.

In 1929 and 1930 Whiston drilled two dry wells on the Wisecarver property. Petroleum Supply Company and Frank Goldman furnished Whiston with oil well supplies and equipment for these wells and the indebtedness therefor was approximately $18,000 to Petroleum Supply Company and $5,000 to Frank Goldman.

In 1933 Goldman became interested in getting a well drilled on the permit lands. Whiston had been served with a notice of default in March, 1933, and later in that year Goldman

talked to Whiston regarding "taking over" the permit. Goldman also talked to Nick Gerard and Harry Bergman, who were also interested. Goldman and Gerard went to talk to Wisecarver, who was president of Midway McKittrick Oil Company and had charge of the negotiations of deals for the company. The company offices were in Modesto, California. Goldman's first trip to Modesto in this connection was in late January or early February of 1934. Goldman and Bergman discussed with Wisecarver the proposition of getting some people to finance development of the permit. They were told that in order for Goldman to get an operating agreement in place of Whiston they would have to remove any interest that Whiston had in the permit; that they would have to get certain quitclaims from anybody else who had any interest in the Whiston operating agreement; and that then Goldman would be given a working agreement to complete a well within one or two years. Goldman and Bergman were further informed that the company had already served notice on Whiston that he was in default and that it looked like it was going to be quite a time before they could get the permit back in the hands of the company; that if he (Goldman) could get Whiston's interest in the permit and any other default that was existing on the permit, he (Goldman) could then get an operating agreement.

After this conversation with Wisecarver and between the 15th and 25th of February, 1934, Goldman, Gerard and Bergman went to see Whiston at his office in Fruitvale. Goldman testified in this connection:

"I talked to Herb and told him that we were trying to get the title of the property in condition so that we could make an operating agreement with Midway McKittrick, and I said that Nick Gerard had Mr. Marks prepare a quitclaim deed of all his right, title and interest to me and that I had $500.00 that I would give him if he would sign it, and he wanted a thousand dollars, and I gave him $500.00; and about a week or ten days later I gave him the other $500.00."

Goldman further testified that Gerard had the quitclaim with him at the time; that "it was a general quitclaim deed whereby he said he quitclaim all his right, title and interest in the Wisecarver permit, with the serial number of the permit, to me"; and that the quitclaim deed was signed by Whiston at that time.

On March 15, 1934, Whiston filed a petition in bankruptcy. He did not list the overriding royalty in the bankruptcy

schedules, it was not administered as an asset of his estate, and the bankruptcy proceedings were closed as a "no asset" estate.

On March 23, 1934, Midway McKittrick gave Goldman an operating agreement and on the same day an agreement was executed by Wisecarver, Tillson and Whiston, parties of the first part, and Midway McKittrick, party of the second part. This agreement provided for the division of royalties, in which it was provided, inter alia, that Whiston, his heirs and assigns were to receive ⅓ of 1 per cent. On October 31, 1946, Whiston executed a written instrument purporting to assign Whiston's ⅓ of 1 per cent interest to Goldman, and on September 16, 1947, Midway McKittrick Oil Company assigned said ⅓ of 1 per cent to Goldman.

In August of 1947, Pacific Western Oil Company, under an assignment from Petroleum Supply Company, went on the land and found oil. One Hausen had worked with Goldman and Petroleum Supply Company and as a result of several visits to Modesto in 1946, he discovered that the ⅓ of 1 per cent interest involved was carried on the books of the Midway McKittrick Company in Whiston's name. Goldman then got in touch with Whiston and secured another assignment of this interest. In the latter part of 1954 one of Whiston's bankruptcy creditors discovered the existence of the royalty involved and upon its petition, the bankruptcy proceedings were reopened. Plaintiff was appointed and qualified as trustee in bankruptcy and this action was filed.

Plaintiff states that his case is predicated upon the premise that title to the royalty involved was vested in Whiston's creditors at all times since the bankruptcy proceedings were filed on March 15, 1934, subject to administration by Whiston's trustee in bankruptcy; that no assignment to defendant Frank Goldman in 1946 or 1947 could effectively have transferred title without an appropriate order of the bankruptcy court. However, the trial court found, inter alia, that it was not true that on March 1 or March 15, 1934, Whiston was the owner of the ⅓ of 1 per cent overriding royalty involved; that it was true that he had disposed of said royalty to Goldman prior to March 15, 1934. These findings are supported by substantial evidence, for in addition to the testimony of Goldman relative to the transfer to him by Whiston of the interest involved between the 15th and 25th day of February, 1934, there was the testimony of Harry Bergman who went

with Goldman and witnessed the transaction with Whiston. Bergman testified that he saw Goldman pay Whiston $500 in cash and that Goldman told Whiston he would pay the balance of $500 in about two weeks, to which Whiston replied that that was "o.k."; that Whiston signed a quitclaim deed to Goldman, which had been prepared by Abe Marks; that the deed was given to Goldman when the $500 was paid to Whiston and that he (Bergman) read the deed; that it contained one page and that it was an assignment "quitclaiming from Herb Whiston to Frank Goldman all his interest"; that "it said that Herb Whiston quieted title and assigned all his right, title and interest of whatsoever nature and kind there may be in and to the Wisecarver permit."

At the time of the trial herein Whiston, Wisecarver, Gerard, Abe Marks and John Heard were all dead and it was stipulated by plaintiff's counsel that Whiston testified in the case of *Hausen* v. *Goldman*, 124 Cal.App.2d 25 [267 P.2d 852], and that in that case he testified that he "had agreed to sell, had given a quitclaim deed of some sort to Mr. Goldman prior to the bankruptcy"; that Whiston further testified that he received $1,000 consideration and immunity or something approaching it for his debts. In this connection it may be observed that *Hausen* v. *Goldman*, 124 Cal.App.2d 25, *supra*, decided by this court, was an action by Hausen to determine the ownership of the ⅓ of 1 per cent royalty involved herein and it was there claimed by Hausen that he had a 50 per cent interest in said royalty by reason of an agreement with Goldman in 1943. Judgment for defendant was affirmed on appeal. In that case Goldman testified that he had obtained quitclaims to the Whiston interest; that he paid Whiston $1,000 therefor and at the time he told Whiston he would cancel all indebtedness which Whiston had with Petroleum Supply Company. Whiston testified that he was indebted to Goldman and Petroleum Supply Company for various sums; that in 1934 he sold all his interest to Goldman for $1,000 and Goldman waived any claim he might have for bills incurred; that he recalled signing some kind of an agreement assigning his interest to Goldman but that he was unable to find the document and that later Goldman brought him papers which he signed. In that case it was held that the evidence was sufficient to permit parol testimony of the lost document.

In the instant case appellant contends that the finding of a lost deed is not supported by substantial evidence.

We do not agree with this contention. Goldman testified that he gave the Whiston quitclaim deed to Nick Gerard, who took it over to Abe Marks; that he did not know what happened to it afterwards; that he had looked among his papers to see if he could find it; that he and Mr. Heard, who had approved the document, spent two hours going through Heard's records and were unable to locate it; that Heard tried to find out something from the files of Abe Marks but could not find the files.

Section 1937 of the Code of Civil Procedure provides that an original writing must be produced and proved except as provided in sections 1855 and 1919. If it has been lost, proof of the loss must first be made before evidence can be given of its contents. ██ Whether there has been a satisfactory accounting of the document is primarily a question for the trial court and, as is said in *Hausen* v. *Goldman, supra,* at page 30:

"The rule is established in California that the sufficiency of the preliminary proof of the loss of a document before testimony as to its contents is received is addressed to the sound discretion of the trial judge (citation), and that the determination of the trial judge that substantial evidence has been introduced to show the loss or destruction of the original document will not be disturbed by an appellate court, in the absence of a showing that the proof of loss or destruction was manifestly insufficient (citations)."

██ We conclude that the evidence herein was sufficient to permit oral testimony of the execution and contents of the quitclaim deed from Whiston to Goldman before the bankruptcy petition of March 15, 1934, was filed by Whiston. Furthermore, it appears from the record that testimony in this connection was admitted without objection in the trial court. Since the trial court determined that Whiston transferred whatever interest he had in the royalty involved prior to the bankruptcy, it follows that the trustee in bankruptcy did not acquire such interest.

In view of what we have heretofore said, it is not necessary to pass upon the question whether there was substantial evidence to support the finding of laches and the bar of the statute of limitations.

Judgment affirmed.

Barnard, P. J., and Griffin, J., concurred.